

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-08-00087-CV

_____

### IN THE MATTER OF J.M.

On Appeal from the County Court at Law
Gregg County, Texas
Trial Court No. 5243-J

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

After having amassed a rather impressive record of offenses, J.M., a juvenile, was placed on probation for felony theft of a motorcycle. On July 7, 2008, the State filed its motion to modify the disposition, alleging that J.M. violated the terms of his probation by committing misdemeanor theft and resisting arrest, among other violations. The trial court found sufficient evidence supported the allegations and modified the disposition, sending J.M. to the Texas Youth Commission (TYC). J.M. moved for a new trial. In response to the motion for new trial, the trial court agreed that an error had been made in the judgment and reformed its judgment to correct that error. J.M. then filed another motion for new trial, this time unsuccessfully. It is from the order sending J.M. to TYC that this appeal is being sought.

On appeal, J.M. presents several points of error. First, he challenges the trial court's decision to modify his disposition, contending it was an abuse of discretion to do so when the evidence was legally and factually insufficient to show that he had committed a criminal offense in violation of the terms of his probation. Second, he challenges the trial court's order, maintaining it is insufficiently specific and, therefore, void. Finally, he lodges two constitutional challenges: (1) he contends the conditions present at the TYC facility constitute cruel and unusual punishment, and (2) he maintains that the trial court's decision to commit him to TYC, rather than a local or nearby youth facility, violated his right to equal protection of the law.

2

## I. CHALLENGES TO SUFFICIENCY OF THE EVIDENCE

### A. Applicable Law and Standard of Review

A trial court's modification of juvenile disposition is governed by Section 54.05 of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 54.05 (Vernon 2008). When a juvenile has previously engaged in delinquent conduct, the trial court may modify the original sentence to commit the juvenile to TYC if the trial court determines, by a preponderance of the evidence, that the juvenile subsequently violated a reasonable and lawful order of the court. TEX. FAM. CODE ANN. § 54.05(f); *In re J.P.*, 136 S.W.3d 629, 632 (Tex. 2004); *In re T.R.S.*, 115 S.W.3d 318, 320–21 (Tex. App.—Texarkana 2003, no pet.).

Modifying a juvenile's probation is a decision which lies within the sound discretion of the trial court, reversible on appeal only on a finding that the trial court abused that discretion. TEX. FAM. CODE ANN. § 54.05; *J.P.*, 136 S.W.3d at 632; *In re J.R.C.*, 236 S.W.3d 870, 875 (Tex. App.—Texarkana 2007, no pet.); *In re M.A.*, 198 S.W.3d 388, 390–91 (Tex. App.—Texarkana 2006, no pet.). A trial court abuses its discretion when it acts arbitrarily or unreasonably or without reference to guiding rules or principles. *J.R.C.*, 236 S.W.3d at 875; *M.A.*, 198 S.W.3d at 391. A trial court does not abuse its discretion if some evidence supports the decision. *J.R.C.*, 236 S.W.3d at 875; *M.A.*, 198 S.W.3d at 391. Put another way, whether there is factually sufficient evidence to support the trial court's findings is a relevant consideration in determining whether the trial court

abused its discretion. *J.R.C.*, 236 S.W.3d at 875; *In re C.J.H.*, 79 S.W.3d 698, 702 (Tex. App.—Fort Worth 2002, no pet.).

One of J.M.'s contentions on appeal is that the State, having pleaded both theft and resisting arrest as separate allegations, but under the same paragraph heading in its motion to modify, was required to prove J.M. committed both offenses in violation of the terms of probation before the trial court may use those allegations to modify the prior disposition. We find no authority to support such a position. To the contrary, a single violation of the conditions of the juvenile's probation is sufficient to support a trial court's order modifying a juvenile's disposition. TEX. FAM. CODE ANN. § 54.05(f); *In re J.A.D.*, 31 S.W.3d 668, 671 (Tex. App.—Waco 2000, no pet.); *In re S.G.V.*, No. 04-05-00605-CV, 2006 Tex. App. LEXIS 2688, at *9–10 (Tex. App.—San Antonio Apr. 5, 2006, no pet.) (mem. op.).

### B. Evidence Presented to Trial Court

Officer Steve Burnette was off duty and working in a loss-prevention capacity (i.e., as security) at a convenience store when he saw J.M. and his friend, D.O., secrete two bags of pork rinds on their persons and then remove the pork rinds (having a retail value of $3.98) from the convenience store without paying for them. Burnette provided the name and address of the convenience store and testified that Don Talley was the owner of that store. Burnette witnessed J.M. stick one bag of pork rinds in his friend's shorts and his friend stick another bag in his own shorts and the two then exited the store. Burnette testified that he first attempted to detain D.O., who

4

succeeded in breaking loose and temporarily escaping from the scene. J.M. resisted as well, but did not get away.

According to Burnette's account of the event:

I just got ahold of [J.M.] and I got one cuff on him and he started hitting and pushing me back -- well, pushing me back, not actually hitting, trying to get away from me and twisting and turning. I took the one cuff that I had in my hand -- because I had one on -- and I started pulling down. And then I got it up behind him, pushed him over the back of the car and got him handcuffed. It was a little bit hard because he had -- not a backpack, but a big bag with him.

Burnette further explained that J.M. was using resistance to "pull away" from him. He had placed a cuff on J.M.'s left wrist and was attempting to get the handcuff on the other wrist when J.M. began to pull away from him. After J.M. was handcuffed and controlled, he showed Burnette the leg monitor he was wearing as ordered by the juvenile court in his previous disposition.

## C.    Discussion

J.M. contends that the State's evidence failed to establish ownership of the stolen pork rinds; the State, he maintains, having alleged that "D. Talley" was the owner of the convenience store, needed to have evidence *from Talley* on the issue of ownership of the pork rinds in order to sustain the charge.[1] The State argues that the evidence from Burnette that he was working for Talley in a

---

[1]The State contends the motion for new trial failed to preserve the issue of factual sufficiency for this Court's review because the assertion in the motion for new trial was too general and because defense counsel did not present an oral argument to the trial court concerning the factual sufficiency of the evidence at the hearing on the motion for new trial. Generally, to be preserved for the court's review, the issue of factual sufficiency of the evidence must first be raised in a motion for new trial to be preserved for this Court's review. *In re M.R.*, 858 S.W.2d 365 (Tex. 1993) (Tex. R. Civ. P. 324(b) requires such). *But see In re J.L.H.*, 58 S.W.3d 242, 246 (Tex. App.—El Paso 2001, no pet.)

security capacity at the convenience store is sufficient to show that Burnette had a greater right to possession of the pork rinds than did J.M.

The State is required to prove J.M. unlawfully appropriated property with intent to deprive the owner of the property. TEX. PENAL CODE ANN. § 31.03(a) (Vernon Supp. 2008). The Texas Penal Code defines an "owner" as a person who "has title to the property, possession of the property, . . . or a greater right to possession of the property than the actor." TEX. PENAL CODE ANN. § 1.07(35) (Vernon Supp. 2008).

The fact that Talley did not testify is of no consequence. Similarly, the State's position that Burnette's testimony showed him to have a greater right to possession than J.M. is not central to the disposition of this issue. The State presented uncontroverted testimony that Talley was the owner of the specific convenience store from which J.M. took the pork rinds and, as the owner of the store, Talley had legal possession of the pork rinds prior to the boys' appropriation. Burnette testified that

---

(this preservation requirement no longer applies to juvenile proceedings since proceeding resembles much more a criminal proceeding).

The Austin court addressed the preservation requirement in a juvenile case coming to it in a similar procedural posture as the instant case. *See In re E.G.*, 212 S.W.3d 536, 538 (Tex. App.—Austin 2006, no pet.). The court cited the general rule found in Rule 33.1 of the Texas Rules of Appellate Procedure concerning preservation of error. TEX. R. APP. P. 33.1. It noted, however, that in an appeal from a nonjury case, an appellant may attack the legal or factual insufficiency of the evidence for the first time on appeal. *E.G.*, 212 S.W.3d at 538; *see* TEX. R. APP. P. 33.1(a), (d).

The issue of factual sufficiency was raised in J.M.'s motion for new trial. Whether it had to be in order to be reviewed is an issue on which sister courts are divided. There is some persuasive authority that would suggest that there was no need to raise the issue in a motion for new trial in order to preserve any error. At any rate, he did. So, to the extent that factual sufficiency is a distinct issue, rather than merely a consideration in determining whether the trial court abused its discretion, the issue is properly before this Court.

6

the boys took the pork rinds without paying for them (i.e., stole them). There is evidence to establish the challenged element of ownership with respect to the offense of theft. Again, evidence of only one violation of the conditions of the juvenile's probation will support the trial court's modification. Here, there is evidence that J.M. committed the offense of theft. There being sufficient evidence that J.M. committed theft, we conclude that the trial court did not abuse its discretion when it modified the disposition, and we overrule the points of error which challenge the sufficiency of the evidence and, concurrently, the contention that the trial court's modification was an abuse of its discretion.

## II. CHALLENGES TO THE LANGUAGE AND VALIDITY OF THE ORDER

### A. Specificity of Trial Court's Findings

J.M. argues that "The juvenile court's findings to remove appellant from his home were not specific enough to warrant removal and sending to the [TYC]." His contention is that the juvenile court's order was deficient because it failed to specifically state the reasons for the modification of the prior disposition.[2] J.M. relies considerably on the proposition that "A statement to the effect that the court finds that the child has violated a reasonable and lawful order of the court does no more than track the statutory language of § 54.05(f)." *A.Y. v. State*, 554 S.W.2d 805, 807 (Tex. Civ.

---

[2]Although J.M. does not challenge the order as too specific, we note that a commitment order to TYC based on a modification of probation for the violation of probation by committing a new act of delinquent conduct should not recite the facts of the new delinquent conduct case. The order need only state that the child violated the first condition of his probation and, in so doing, violated a reasonable and lawful order of the court. To include the new offense in the order could subject the child to a longer minimum stay in the commission without the full due process rights afforded a child in an adjudication hearing. *In re S.J.*, 940 S.W.2d 332, 338–39 (Tex. App.—San Antonio 1997, no writ).

App.—San Antonio 1977, no writ). The *A.Y.* court, citing *In re A.N.M.*, 542 S.W.2d 916, 919 (Tex. Civ. App.—Dallas 1976, no writ), continued, stating that the word "specifically" in Section 54.04(f) "emphasizes that the legislature intended the court to do more than merely track the statutory language." *A.Y.*, 554 S.W.2d at 807.

The Texas Family Code requires that the trial court make the following three findings to remove the child from the home and commit the child to TYC:

1)      It is in the child's best interest to be placed outside the home.

2)      Reasonable efforts were made to prevent or eliminate the need for the child's removal from the home and to make it possible for the child to return home.

3)      The child in the home cannot be provided the quality of care and level of support and supervision that the child needs to meet the conditions of probation.

TEX. FAM. CODE ANN. § 54.05(m). The trial court's modification order includes all three required findings. J.M. complains that the mere tracking of the statutory language in these findings is insufficient and that the failure to elaborate on those mandatory findings is reversible error.

In addition to making these mandatory findings, the trial court's order states the following:

> The Court finds beyond a reasonable doubt that the Juvenile did engage in delinquent conduct and the material allegations in the motion to revoke probation, to-wit: Heretofore, on the 16th day of August, 2007, the child herein, was found to have engaged in delinquent conduct in the above styled and numbered cause for the **FELONY** offenses of **BURGLARY OF A BUILDING (2 COUNTS)** and the **MISDEMEANOR** offense of **THEFT**, and on the 16th day of August, 2007, was placed on probation. Additionally, on the 29th day of November, 2007, the child herein, was found to have engaged in delinquent conduct in the above styled and

numbered cause for the **FELONY** offense of **UNAUTHORIZED USE OF A VEHICLE** and the **MISDEMEANOR** offense of **BURGLARY OF A VEHICLE**, and on the 29th day of November, 2007 was placed on probation. Additionally, 29th day of May, 2008, the child herein, was found to have engaged in delinquent conduct in the above styled and numbered cause for the **FELONY** offense of **THEFT**, and on the 29th day of May, 2008, was placed on probation in this cause under the reasonable and lawful terms and conditions of probation determined by the Court for a period of one (1) year with Intensive Supervision.

The trial court's order adds reasons for its finding that J.M.'s commitment to TYC is appropriate:

In addition, the Court commits the child respondent to the Texas Youth Commission for the following reasons.
The seriousness of the offense requires that the child respondent be placed in a restrictive environment to [protect] the public.
Local resources of the Court are inadequate to properly rehabilitate the child respondent.

The Texas Family Code provides, "The court shall specifically state in the order its reasons for modifying the disposition." TEX. FAM. CODE ANN. § 54.05(i). Compliance with these requirements is mandatory, for such findings "provide assurance that the child and his family will be advised of the reasons for [removal from the home] and . . . be in a position to challenge those reasons on appeal." *J.L.E. v. State*, 571 S.W.2d 556, 557 (Tex. Civ. App.—Houston [14th Dist.] 1978, no writ). When a juvenile court does not comply with the specificity requirements, the reviewing court does not reverse for a new trial, but, generally, remands instead to the trial court with instructions for the juvenile judge to render a proper disposition order specifically stating the reasons for such disposition. *K.K.H. v. State*, 612 S.W.2d 657, 658 (Tex. Civ. App.—Dallas 1981, no writ); *A.Y.*, 554 S.W.2d at 806–08; *see* TEX. R. APP. P. 44.4.

The modifying order must specifically recite the conduct which prompted the trial court to modify its prior order of disposition. *See K.W.H. v. State*, 596 S.W.2d 248 (Tex. Civ. App.—Texarkana 1980, no writ); *see also In re L.T.H.*, No. 03-06-00433-CV, 2007 Tex. App. LEXIS 7340 (Tex. App.—Austin Sept. 6, 2007, no pet.). Providing specific reasons for the disposition provides the child with notice of the court's reasons so that the child can determine the need for an appeal. *In re J.R.*, 907 S.W.2d 107, 110 (Tex. App.—Austin 1995, no writ). Additionally, a record is created for the appellate court to rely on in making its decision about whether sufficient evidence supports the juvenile court's findings and determinations. *In re L.R.*, 67 S.W.3d 332, 336–37 (Tex. App.—El Paso 2001, no pet.). Therefore, merely reciting statutory language will not be sufficient to justify the juvenile court's ruling. *In re J.T.H.*, 779 S.W.2d 954, 959 (Tex. App.—Austin 1989, no writ). However, statutory language supplemented by additional findings is sufficient to meet the requirements of the Texas Family Code. *See In re P.L.*, 106 S.W.3d 334, 338 (Tex. App.—Dallas 2003, no pet.) (order tracking language of Section 54.05 and explaining court's reasons was appropriate). The inclusion of the offense and its surrounding circumstances in an order consisting of mainly statutory language is sufficient. *See J.T.H.*, 779 S.W.2d at 959.

Here, the trial court included the mandatory statutory findings in compliance with Section 54.05(m). TEX. FAM. CODE ANN. § 54.05(m). It also included considerable specific additional information, including virtually a complete history of J.M.'s juvenile record. The trial court's order,

having included the required statutory language and specific information as well, is sufficiently specific. We overrule this point of error.

## B. Error Claimed in Including Both Offenses in One Paragraph

J.M. contends that the trial court erred by including the offense of resisting arrest and theft of under fifty dollars in one paragraph, taking the position that such error renders the entire order void.[3] He distinguishes the two offenses by correctly pointing out that the offense of resisting arrest is a class A misdemeanor (punishable by confinement), while theft of under fifty dollars is a class C misdemeanor (not punishable by confinement). He continues, citing Section 54.05, which provides that "a disposition based solely on a finding that the child engaged in conduct indicating a need for supervision may not be modified to commit the child to the [TYC]." TEX. FAM. CODE ANN. § 54.05(g). From this, he extrapolates that since theft on these facts would be characterized as conduct indicating a need for supervision, theft could not be basis for commitment to TYC.[4]

---

[3]J.M. mentions the irregularity in the written order's use of "Your Petitioner," but does not seem to specifically complain of any error associated with the mix-up in perspective. The State, understanding that J.M. complains of this use, asks the Court to reform the errors, maintaining they are clerical in nature and merely a result of a cut and paste approach to drafting the trial court's order. Indeed, the State's application to revoke probation does contain such language. However, since J.M. does not contend the language renders the order void or represents reversible error, we do not address the issue.

[4]A class C misdemeanor is a fine-only offense which is not considered delinquent conduct; instead it can be considered conduct indicating a need for supervision. TEX. FAM. CODE ANN. § 51.03(a), (b)(1)(A) (Vernon 2008). J.M.'s contention may be a successful one if J.M.'s probation were based on theft under fifty dollars or other conduct indicating a need for supervision and if the State were now moving to modify the disposition by revoking that probation. Such is not the case. Here, we are called on to review a modification proceeding in which the State alleged that J.M.

11

The State correctly maintains that the theft as alleged would properly support a modification and commitment because Section 54.05(f) permits modification of probation which has been previously imposed due to the commission of a felony offense. The felony offense here is the theft of the motorcycle, the delinquent conduct for which J.M. was most recently placed on probation. *See* TEX. FAM. CODE ANN. § 54.05(f). The State appropriately contends that the underlying theft of a motorcycle was the relevant felony for the first adjudication, after which probation may be modified and the juvenile committed based on a showing that the juvenile violated a term of his previously assessed probation. The original order imposing probation based on the delinquent conduct of theft of the motorcycle required J.M. to obey all laws of the State, a provision that either offense (either the class A misdemeanor or the class C misdemeanor) violated.

**C.      Correction of Punishment Available for Theft as Alleged**

The trial court's order does incorrectly suggest that both offenses are punishable by confinement:

---

violated the terms of his probation by committing criminal offenses. So, in this regard, whether J.M. could be committed to TYC if adjudicated guilty of one offense or the other has no bearing on the outcome of this proceeding.

12

<u>X</u>     e.     Violation (1)[5] is a violation of a penal code of Texas punishable by imprisonment/confinement in jail.

Theft of property the value of which is less than fifty dollars is a class C misdemeanor, punishable as such by fine only. TEX. PENAL CODE ANN. § 12.23 (Vernon 2003), § 31.03(e)(1)(A) (Vernon Supp. 2008).

This error does not affect the validity of the trial court's judgment because the evidence is sufficient to show that J.M. committed theft, a criminal offense the commission of which is a violation of his probation—whether or not it is a jailable offense. The statement in the order that

---

[5]The reference to "(1)" comes from the State's motion in which it alleged:

(1)     On or about the 27th day of June, 2008, the said child violated a penal law of this State punishable by imprisonment or confinement in jail, to-wit: **RESISTING ARREST**, § 38.03 of the Texas Penal Code, in that he did then and there, in the County of Gregg and State of Texas, intentionally or knowingly prevent or obstruct S. Burnette, a person the child knew to be a peace officer, from effecting an arrest of said juvenile-respondent, by using force against said peace officer, to-wit: by pushing said officer with his hand, the same being a Class A misdemeanor if committed as an adult.

On or about the 27th day of June, 2008, the said child violated a penal law of this State punishable by fine only, to wit: **THEFT**, § 31.03 of the Texas Penal code, in that he did then and there, in the County of Gregg and State of Texas, unlawfully appropriate, by acquiring and otherwise exercising control over, property, to-wit: food, of the value of less than $50.00, from D. Talley, the owner thereof, with intent to deprive the owner of the property, the same being a Class C misdemeanor if committed as an adult.

13

both theft under fifty dollars and resisting arrest are punishable by confinement is, nevertheless, inaccurate.

The Texas Family Code authorizes this Court to modify the judgment:

> The appellate court may affirm, reverse, or modify the judgment or order, including an order of disposition or modified disposition, from which appeal was taken. It may reverse or modify an order of disposition or modified order of disposition while affirming the juvenile court adjudication that the child engaged in delinquent conduct or conduct indicating a need for supervision. It may remand an order that it reverses or modifies for further proceedings by the juvenile court.

TEX. FAM. CODE ANN. § 56.01(i) (Vernon 2008). We have the authority to correct, modify, and reform a judgment to make the record speak the truth when the matter has been called to our attention and we have the necessary information to do so. *In re K.B.*, 106 S.W.3d 913, 916 (Tex. App.—Dallas 2003, no pet.); *see In re J.K.N.*, 115 S.W.3d 166, 174 (Tex. App.—Fort Worth 2003, no pet.) (court is authorized to modify juvenile court's judgment). The authority of the appellate courts to reform judgments is not limited to those situations involving mistakes of a clerical nature. *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993). That said, we are authorized to and do correct the trial court's order to reflect that the theft which J.M. was found to have committed is a class C misdemeanor. TEX. R. APP. P. 43.2(b).

14

## III.   CONSTITUTIONAL CHALLENGES

### A.   Cruel and Unusual Punishment

#### 1.   J.M.'s Account of His Stay at TYC

At a hearing on his motion for new trial, J.M. testified to a laundry list of unpleasant occurrences he has experienced while incarcerated at TYC: (1) He was solicited on four or five occasions to join a gang at TYC's McLennan County Orientation and Assessment Unit. (2) He has witnessed a fight every day that he has been there, although he has not engaged in any himself. (3) He testified that there are usually only two staff members (usually women) to supervise the twenty-five boys in each unit or dormitory and that the staff acts as if they are not really concerned about the fighting. (4) On several occasions, the juvenile in the bed next to J.M. threatened to shank him with a filed-down four-to-five-inch screw and then to put his penis in J.M.'s ear. Although J.M. reported the threats to staff members, they took no action to remedy it. After having reported the situation to the supervisor and asking to be moved, J.M. was only moved to the other side of the room. (5) He was threatened with violence for his decision to not join a gang.

On cross-examination, J.M. confirmed that there are surveillance cameras installed on the premises. He suggests that as a result of the threats against him, there was a dormitory shakedown, during which the staff recovered five screws in the possession of the person who had threatened J.M. J.M. went on to say that his nemesis had surreptitiously placed one of those screws under J.M.'s own bed and that the other young man had been sent to a security lockup for twenty-four hours as a

15

disciplinary measure.  J.M. admitted that this was the only specific person with whom he had continued, identifiable problems.  He did, however, report more general conflicts with the unwanted gang recruitment.  He testified that the constant fighting results in constant reporting of those fights.

## 2. When Conditions of Confinement Can Be Cruel and Unusual

The Eighth Amendment prohibits the infliction of punishment that can be characterized as "cruel and unusual."  U.S. CONST. amend. VIII; TEX. CONST. art. I, § 13.  "Juvenile cases, though classified as civil proceedings, are quasi-criminal in nature and frequently concern constitutional rights and procedures normally found only in criminal law."  *In re H.V.*, 252 S.W.3d 319, 323 (Tex. 2008).  Due to this similarity, we examine cases involving claims of cruel and unusual punishment in the context of confinement for criminal offenses for guidance here.  Confinement in a state-prison facility is a form of punishment subject to scrutiny under the Eighth Amendment.  *See Rhodes v. Chapman*, 452 U.S. 337, 345 (1981).  The Eighth Amendment's prohibition of cruel and unusual punishment was made applicable to the states by the Due Process Clause of the Fourteenth Amendment.  *Robinson v. California*, 370 U.S. 660 (1962); *Ladd v. State*, 3 S.W.3d 547, 564 n.10 (Tex. Crim. App. 1999).

We note that the Constitution does not mandate comfortable prisons.  *See Rhodes*, 452 U.S. at 349.

> Today the Eighth Amendment prohibits punishments which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain," or are grossly disproportionate to the severity of the crime.  Among "unnecessary and wanton" inflictions of pain are those that are "totally without penological justification."

*Id.* at 346 (citations omitted).  There should not be a gross disproportionality between the conditions of confinement and the severity of the offense or condition which led to the confinement.  *See id.* at 347.

J.M. does not address the seriousness of the offenses with which he was charged or the persistence of his conduct that precipitated the order of commitment to TYC.  Further, the thrust of his argument does not advance the theory that he has been singled out for any treatment by TYC officials as any punitive measure.  Rather, his allegations seem to rest upon the contention that the generally dangerous or frightening conditions to which virtually all those incarcerated at TYC are subjected during their stays amounts to the imposition of cruel and unusual punishment.

Much of the caselaw defining the term "cruel and unusual" rise from actions in tort wherein inmates in prison situations have sought to recover damages from the prison officials for what they have alleged were their subjection to cruel and unusual punishment.  While not controlling here, it provides some guidance in drawing the parameters of the term "cruel and unusual."

In order to prove a claim of Eighth Amendment cruel and unusual punishment in a tort case against prison officials involving the "prison-conditions" context, an inmate must demonstrate: (1) that the deprivation alleged was "sufficiently serious" and (2) that there was an unnecessary and wanton infliction of pain.  *Farmer v. Brennan*, 511 U.S. 825 (1994).

In cases involving a failure to prevent harm, the plaintiff must demonstrate an incarceration under conditions posing a substantial risk of serious harm.  *Scott v. Britton*, 16 S.W.3d 173, 181

17

(Tex. App.—Houston [1st Dist.] 2000, no pet.).  In order to be "[O]bjectively, 'sufficiently serious' . . . a prison official's act or omission must result in the denial of the 'minimal civilized measure of life's necessities.'"  *Farmer*, 511 U.S. at 834 (citations omitted).  Although routine discomfort inherent in the prison environment is inadequate to satisfy an Eighth Amendment inquiry, only "those deprivations denying 'the minimal civilized measure of life's necessities' . . . are sufficiently grave to form the basis of an Eighth Amendment violation."  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (quoting *Rhodes*, 452 U.S. at 347).  In determining whether a constitutional violation has occurred, we must consider the circumstances, nature, and duration of a deprivation of these necessities.  *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).

An inmate does have an Eighth Amendment right to be reasonably protected from the constant threat of assaults and violence by fellow inmates.  *See City of Waco v. Hester*, 805 S.W.2d 807, 812–13 (Tex. App.—Waco 1990, writ denied).  A pervasive risk of harm is deemed to exist when inmates are assaulted by other prisoners with such frequency that there is a reasonable fear for their safety and jail personnel are reasonably apprised of the existence of the threat to inmate safety and the need for protective action.  *Id.* at 816; *see also State v. Mungia*, 119 S.W.3d 814, 817 (Tex. Crim. App. 2003) (concluding no constitutional violation had occurred where record showed only the possibility appellee may be killed if sent to prison).

In determining whether the conditions of confinement violate the Eighth Amendment, the courts consider all of the circumstances of incarceration in order to arrive at a decision as to whether

18

the circumstances affront contemporary standards of decency. *Rhodes*, 452 U.S. at 362–63; *Stewart v. Winter*, 669 F.2d 328, 335–36 (5th Cir. [Miss.] 1982). The several conditions that might lend themselves to finding an overall violation must have a mutually enforcing effect that results in the deprivation of a single, identifiable human need such as food, warmth, or exercise. *Wilson*, 501 U.S. at 304.

Here, the evidence upon which J.M. relies is primarily anecdotal, showing attempts at intimidation by other TYC detainees and repeated fights among those other detainees, all of which apparently has caused him to fear for his safety. He has not alleged that he has actually suffered any physical harm by either other detainees or action on the part of TYC officials to unreasonably discipline him.

For the most part, people who are prone to obey rules and to follow the general mores of society are unlikely to be housed in TYC; it is not a church camp. It is likely that J.M.'s experience is not substantially different from most other persons in the custody of TYC and he is, in essence, requesting that we find that anyone who is placed in the custody of TYC has been deprived of constitutional rights. J.M.'s testimony and the quarterly reports concerning the reporting of incidences made within TYC do not establish an Eighth Amendment violation. The public has heard that TYC has experienced a good deal of safety concerns and problems with reporting of incidences, especially concerning misconduct by staff. However, J.M.'s account of *his* treatment and experience in the McLennan Unit fails to demonstrate the evidence of cruel and unusual punishment. According

19

to J.M., he did report the threats made from the other juvenile concerning the shank and threatened sexual assault. The record suggests that at some point following his report or reports, the staff conducted a search of the dormitory and recovered the shanks, one of which was found under J.M.'s bed. Further, J.M. was moved away from that particular juvenile. While it is not entirely clear, it appears there is a common sleeping room at the facility, and J.M. was moved to the other side of that common area. J.M.'s specific testimony concerning the threats while in the facility are limited to the threats from this juvenile which, from the record, appear to have been addressed. His more general testimony regarding the gang recruitment provides very little detail other than a threat of being accosted if he did not join. The record is not clear that he reported those incidents.

It appears that J.M.'s stay at the facility has not been a pleasant one; the Constitution does not guarantee that it will be.[6] It does appear the staff has taken measures to remove or reduce the risk

---

[6]J.M. relies a great deal on *Morales v. Turman*, 364 F. Supp. 166 (E.D. Tex. 1973). In *Morales*, the court addressed both widespread and rampant physical and psychological abuse by staff at TYC, including segregation and beatings and the practice of placing juveniles in a TYC facility without a hearing on the danger to society posed by the juvenile. The *Morales* court concluded that the treatment of the class of juveniles ran afoul of the Eighth Amendment and that the placement in TYC custody without a hearing violated the juveniles' rights to due process. Based on these conclusions, the court ordered emergency temporary relief in 1973, enjoining a number of TYC's practices, setting forth practices to screen prospective TYC staff, and prohibiting segregation. *Id.* at 175–76. Ten years and much litigation later and after a virtual overhaul of the juvenile justice system, the case was settled. *See Morales v. Turman*, 569 F. Supp. 332 (E.D. Tex. 1983). The instant case varies in both nature and degree. J.M. does not allege physical abuse by TYC staff; he alleges the threat by other inmates poses a risk of harm to him and that the staff has failed to adequately reduce that risk. Further, the degree of abuse and improper procedure present in the *Morales* case is shocking, far more widespread and identifiable than the evidence presented here. We also note that the *Morales* case was not, as here, based almost solely upon the personal anecdotal renditions of a single youth, but involved an in-depth examination of the entire TYC system.

20

to J.M. posed by the threatening juvenile. So, now that the search removed the shanks with which he was threatened and removed J.M. away from that juvenile, J.M. cannot establish that he continues to experience a sufficiently serious risk of harm. Further, and more definitively, J.M.'s contention fails to establish that TYC officials did not take steps to address J.M.'s concerns for safety, and TYC cannot be said to have acted in reckless disregard of the threats posed to J.M. We overrule J.M.'s point of error concerning cruel and unusual punishment.[7]

### 3. Further Considerations Concerning Judicial Role

Further, we are mindful of our role in the administration of justice. When reviewing policies designed to preserve internal order, discipline, and security, a court should accord broad deference to prison administrators regarding the reasonableness of the scope, the manner, the place, and the justification of a particular policy. *Block v. Rutherford*, 468 U.S. 576, 585 (1984); *Hay v. Waldron*, 834 F.2d 481, 486 (5th Cir. 1987). In other words, courts should play a very limited role in the administration of detention facilities. *Block*, 468 U.S. at 584.

---

[7]Even if J.M. satisfied the *Farmer* test, the proper remedy is likely not to allow J.M. to be back on probation as he requests. A constitutional violation relating to prison conditions does not usually entitle a prisoner to release, but to an injunction against the prohibited practices or an order requiring the correction of unconstitutional conditions. *Cook v. Hanberry*, 596 F.2d 658, 660 (5th Cir. 1979). In some instances, courts have ordered prison officials to station specific numbers of guards in areas where the threat of violence was high in order to protect the general inmate population. *See Williams v. Edwards*, 547 F.2d 1206, 1213–14 (5th Cir. 1977).

**B.      Equal Protection**

**1.      J.M.'s Contention**

The Equal Protection Clause of the Federal and State Constitutions prevents the government from discriminating against any person or class of persons. U.S. CONST. amend. XIV; TEX. CONST. art. I, § 3; *see Ingram v. State*, 124 S.W.3d 672, 677–78 (Tex. App.—Eastland 2003, no pet.). One claiming that his right to equal protection of the law must show that a state actor intentionally discriminated against him because of his membership in a protected class. *Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 341 (6th Cir. 1990). "Unless a statute challenged on equal-protection grounds interferes with a fundamental right or discriminates against a suspect class, we review that statute using the rational-basis test." *Ingram*, 124 S.W.3d at 677 (citing *Black v. State*, 26 S.W.3d 895 (Tex. Crim. App. 2000)). The rational-basis test provides that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985). Protection of the public health, safety, morals, or some other phase of the general welfare is a legitimate state interest. *Ingram*, 124 S.W.3d at 678. The *Ingram* court quotes:

> The Legislature may classify law violators and impose different penalties, inhibitions and restrictions upon the several classes, provided there is a reasonable basis for the classification.   In determining whether there is a reasonable basis for the classification there is a general presumption that the Legislature has done its duty, not violated the Constitution; and therefore the classification will be upheld unless it appears, clearly and without doubt, that it has no reasonable basis of support.

22

*Ingram*, 124 S.W.3d at 677–78 (quoting *Watts v. Mann*, 187 S.W.2d 917, 924 (Tex. Civ. App.—Austin 1945, pet. ref'd)). An equal protection challenge to the rational basis will fail "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

J.M. argues that "[O]thers who evidently have access to money through county funding are placed [at the Willoughby Center]." We have taken J.M.'s argument as one complaining of the following state action: the trial court's decision to commit him to custody of TYC rather than placing him in another facility such as the Willoughby Center. Although J.M. argues that he is a member of a suspect class, he does not develop its application. The matter is complicated by the discussion at the modification hearing concerning state funding. That aside, according to the Sanction Level Assignment Model, the trial court could have been authorized to assign J.M. a level higher than five.[8] Section 59.009 could be applied to these facts, assigning a level six sanction including commitment to TYC. The record before us suggests that the Willoughby Center is a place for sanction level five offenders.

---

[8]J.M does not and, it seems, is not permitted to appeal a departure from the Sanction Level Assignment Model. TEX. FAM. CODE ANN. § 59.014(3) (Vernon 2008). The model is treated more as a guide than a mandatory classification scheme. *In re C.C.*, 13 S.W.3d 854, 858 (Tex. App.—Austin 2000, no pet.).

### 2. Examining Funding Considerations

Here, there was some discussion regarding availability of state funding, but nothing concerning J.M.'s economic status. His ability to pay any fines or restitution does not appear to have been a factor in the trial court's decision to commit J.M. to TYC.

Funding considerations were discussed as a part of the trial court's decision to commit a juvenile to TYC in *In re S.G.*, No. 04-04-00475-CV, 2005 Tex. App. LEXIS 2560 (Tex. App.—San Antonio Apr. 6, 2005, no pet.) (mem. op.). In *S.G.*, the trial court had agreed with the probation officer's recommendation that placement at a county facility "was inappropriate because it was 'probation resources.'" *Id*. at \*11. The trial court ultimately decided that commitment to TYC was more appropriate because "resources would come from the State rather than the County." *Id.* The *S.G.* court explained that such reason did not conform to the stated goals of the juvenile justice code. *See* Tex. Fam. Code Ann. § 51.01 (Vernon 2008) (stating that primary concern of juvenile justice code is to provide for protection of public and public safety balanced with goal of providing for care and protection of juvenile while placing an emphasis on a program of treatment, training, and rehabilitation). The court reversed the trial court's judgment, concluding that the written order's primary reason for revocation was that the juvenile had exhausted probation's attempts to rehabilitate her. *S.G.*, 2005 Tex. App. LEXIS 2560, at \*12. The record, however, showed insufficient evidence to support the trial court's conclusion that probation had expended all resources in an effort to rehabilitate the juvenile. *Id.*

Unlike *S.G.*, the record here contains sufficient evidence to support the trial court's decision to place J.M. in TYC custody. The trial court did not indicate that he made such decision based on any economic considerations. The discussion of funding at the hearing here was, as the *S.G.* court explained, inconsistent with the stated goals of the juvenile justice code. The records indicate that J.M. was no longer eligible for placement as a level five offender. The trial court's decision here was supported by relevant evidence, and the record shows that the funding discussion, although inappropriate, was not the basis for the trial court's decision.

Looking at the trial court's action and considering that J.M. is not a member of a suspect class, we apply the rational-basis test. Here, based on several serious felonies and misdemeanors, the trial court could have assigned a sanction level higher than that permitted at the specific facility which J.M. prefers, providing a rational basis for the action and classification. Applying the rational-basis test to the Sanction Level Assignment Model in Section 59.003 of the Texas Family Code, we determine that the State has a legitimate interest in protecting the public health, safety, and morals. J.M. has not overcome the general presumption that the State has not violated the United States or Texas Constitutions. We overrule this point of error.

IV.    **CONCLUSION**

Because the trial court did not abuse its discretion by modifying J.M.'s disposition and committing him to TYC, because the modification order is sufficiently specific, and because J.M. has failed to establish that his commitment to TYC is cruel and unusual punishment or is a violation

of his right to equal protection of the law, we overrule his points of error. J.M. is correct in that the modification order contains an error when it states that theft, in this situation, is punishable by confinement; that error, however, does not affect the validity of the order or the outcome of the case. We have and do exercise the authority to correct the trial court's order to reflect that the offense of theft, on these facts, is not, as the order states, punishable by confinement. We affirm the judgment as corrected.

Bailey C. Moseley
Justice

Date Submitted:     April 2, 2009
Date Decided:      June 16, 2009