

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00360-CV
No. 02-24-00361-CV

_____

IN THE MATTER OF R.R.

On Appeal from County Court at Law No. 1
Denton County, Texas
Trial Court Nos. JV-2021-00593, JV-2023-00200

Before Birdwell, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Birdwell

**MEMORANDUM OPINION**

R.R., a juvenile, appeals the trial court's "Order of Modification [and] Disposition" committing him to the Texas Juvenile Justice Department (TJJD) for an indeterminate period not to exceed his nineteenth birthday. In one point of error, R.R. argues that because there was insufficient evidence, the trial court abused its discretion by ordering him committed to the TJJD. We affirm.

## I. Background

### A. Initial Offense and Previous Modifications

In April 2022, R.R. stipulated to and was adjudicated delinquent for the offense of theft of property—a golf cart—valued more than $2,500 but less than $30,000, an offense classified as a state jail felony. *See* Tex. Penal Code Ann. § 31.03(e)(4)(A). The trial court placed him on probation for twelve months for that offense.

Two months later, the State moved to modify the trial court's disposition after R.R. committed the offense of disorderly conduct by pointing a BB gun at another child. R.R. stipulated to that offense, and in November 2022, the trial court modified its prior disposition and placed R.R. on Intensive Supervision Probation (ISP) for twenty-eight months—until March 2025.

In March 2023, the State moved to modify the trial court's disposition after R.R. committed the offense of fraudulent use of identifying information by obtaining or acquiring someone else's debit card number. In its motion, the State also alleged that R.R. had violated the conditions of ISP by receiving school suspension and

2

multiple absences from class, by failing to call and check in with his juvenile probation officer on several dates, and by failing to appear for several scheduled office visits with his juvenile probation officer. R.R. stipulated to that offense and to the State's allegations, and in May 2023, the trial court modified its prior disposition and placed R.R. on ISP for twenty-four months, which included a placement at Denton County Post Adjudication Courage to Change—a long-term residential placement facility.

## B. Present Modification

Within his first week at the Post facility, R.R. had received multiple rule violations. In one incident, two staff members had to escort R.R. to his room after he refused their attempts to verbally de-escalate him. After approximately ten months at Post, he was unsuccessfully discharged from the program with fifty-one minor rule infractions and three major rule violations.

Following R.R.'s unsuccessful discharge from Post, the State filed another motion to modify the trial court's disposition. R.R. stipulated to the unsuccessful-discharge allegation, and the trial court set the matter for a disposition hearing.

Pending the disposition hearing, R.R. was released to his mother's custody.[1] He returned home and remained in his mother's custody for approximately two-and-a-

---

[1]At that time, R.R. had an open warrant in Dallas County for a misdemeanor theft charge. Believing that R.R. would be picked up by Dallas County and held for continued detention on that offense, the trial court released him from detention. However, Dallas County recalled the warrant. Because R.R. had already been released, he returned home until the disposition hearing.

half months. During that time, he improved his behavior and mostly stayed out of trouble.

## C. Disposition–Modification Hearing

At the hearing, the trial court heard testimony from R.R.'s juvenile probation officer, Jennifer Jenson, and from R.R.'s mother.

Jenson confirmed the various offenses and probation violations alleged in the State's motions to modify. She testified that R.R. had been placed in the community on probation three times and that the Denton County Juvenile Probation Department had made reasonable efforts to rehabilitate him.

Jenson expressed that she had seen progress in the two years that she had been handling R.R.'s case. She recommended that R.R. be placed on probation again. She explained that he needed more counseling and that he needed to work on developing skills to control his impulsivity. She noted, however, that if the trial court followed her recommendation, R.R. would be placed on probation in a different county because his family had moved out of Denton County before the disposition hearing. Therefore, Jenson—a Denton County probation officer—would no longer supervise R.R.'s probation, and she did not know what probation services would be provided to him in the new county.

The State then asked Jenson about the services that would be available to R.R. if he were placed in the TJJD instead of probation. She explained that he could obtain a GED or high school diploma. He could also learn social skills and develop coping

4

skills to help him progress, and he would have access to both individual and group counseling.

Mother's testimony focused on the two-and-a-half months that R.R. was home awaiting the disposition hearing. During that time, R.R. mostly stayed out of trouble; he violated the terms of his release once when he went with an older cousin to a gas station. Mother explained that, after speaking to his probation officer, R.R. understood what was expected of him, and there were no other violations. For two-and-a-half months, R.R. had a consistent routine, worked with his stepfather doing landscaping, and kept up with his medication. And the family, which had been previously living in hotels, had acquired and was living in a stable home.

While Mother acknowledged that R.R. had had behavioral issues "prior to th[ose] last few months," she testified that he had been responding to her rules and supervision and that he had not had any behavioral issues since he returned home. Mother told the trial court that she did not want R.R. to go to the TJJD and that, if he were placed on probation, she would do her part to ensure that he succeeded.

In addition to the testimony presented at the hearing, the trial court reviewed R.R.'s social history and PACT[2] Full-Screen Summary Report that was completed after R.R. left Post. The report indicated several risk factors, including mental health concerns, emotional abuse, and family violence. His need level was "Moderate" and

---

[2]PACT stands for Positive Achievement Change Tool. *In re Z.M.*, No. 02-21-00213-CV, 2021 WL 4898851, at *4 n.3 (Tex. App.—Fort Worth Oct. 21, 2021, no pet.) (mem. op.).

5

his overall risk to reoffend was "High." R.R. exhibited risk factors of antisocial personality: high impulsivity, an inability to control impulsive behavior, a propensity for temper tantrums, and a lack of behavioral alternatives to aggression. He also exhibited risk factors of criminal thinking: indifference about committing crimes, a lack of empathy for his victims, a belief that rules only sometimes apply to him, a tendency to minimize or blame others, and a resentment toward authority.

Regarding education, R.R. did not believe that education was valuable or that school was encouraging. In December 2021, R.R. withdrew from school because he had been failing all his core classes and would not pass that grade level. He received multiple school conduct violations, and in one incident, he was sent to an alternative school because he had brought a taser onto school grounds. In another incident, R.R. was suspended for three days after he threw a milk carton at another student. While he was at Post, R.R. made "mostly Cs and Ds, some Fs," and he attended his classes regularly.

As for R.R.'s home, the report indicated that there had been "[c]onsistently insufficient punishment" and that R.R. did not respond to parental supervision. He had a history of running away from home after arguments with Mother, and while he was on ISP, he would leave the residence without permission. Mother had reported that R.R. defied parental authority and that he "caused chaos in their home." His "bad behavior" had even caused the family to be evicted numerous times.

The report also highlighted the probation department's efforts to rehabilitate R.R. Despite multiple attempts to make services available to R.R. and his family—such as life skills mentoring and family preservation counseling—they did not take advantage of those services. Indeed, R.R. was unsuccessfully discharged from the mentoring program, and the family never started counseling.

**D. Judgment and Commitment**

After hearing all the evidence, the trial judge stated on the record that R.R.'s high risk of reoffending was "extremely concerning" and that his "good behavior" in the two-and-a-half months he spent at home before the disposition hearing was "like the white-knuckled good behavior to get to th[at] point." The trial judge noted that a child's life is not "static" and explained that while she "do[es] very much believe in consequences," she also believed in "changed trajectories," asking "where is this going to stop?"

The trial court found that R.R. had violated the terms of his probation and, after weighing the evidence, determined that the removal-from-the-home criteria had been met. In its disposition order, the trial court sustained the State's motion to modify and committed R.R. to the TJJD for an indeterminate period not to exceed his nineteenth birthday. The trial court found that it was in R.R.'s best interest to be placed outside his home; that reasonable efforts had been made to prevent or eliminate the need for R.R.'s removal from his home and to make it possible for him to return home; and that R.R., in his home, "[could ]not be provided the quality of

7

care and level of support and supervision that [he] need[ed] to meet the conditions of probation." The trial court also made a "special commitment finding that [R.R.] ha[d] behavioral health or other special needs that [could ]not be met with the resources available in the community."

## II. Standard of Review

We review a trial court's decision to modify a juvenile disposition for an abuse of discretion. *See In re J.P.*, 136 S.W.3d 629, 632–33 (Tex. 2004). A juvenile court has broad discretion to determine a suitable disposition for a child who has been adjudicated as having engaged in delinquent conduct. *In re J.D.P.*, 85 S.W.3d 420, 426 (Tex. App.—Fort Worth 2002, no pet.). This is particularly true in proceedings to modify a juvenile's earlier disposition. *In re D.R.A.*, 47 S.W.3d 813, 815 (Tex. App.—Fort Worth 2001, no pet.). A juvenile court abuses its discretion when it acts unreasonably or arbitrarily—without reference to any guiding rules or principles. *See In re C.J.H.*, 79 S.W.3d 698, 702 (Tex. App.—Fort Worth 2002, no pet.).

Legal and factual sufficiency are relevant factors in determining whether the trial court abused its discretion. *Id.* In the disposition phase of a juvenile proceeding, we apply the civil standard of review to evidentiary-sufficiency challenges. *In re M.C.S., Jr.*, 327 S.W.3d 802, 805 & n.3 (Tex. App.—Fort Worth 2010, no pet.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979)); *In re M.D.H.*, 139 S.W.3d 315, 317 (Tex. App.—Fort Worth 2004, pet. denied) (mem. op. on reh'g).

We may sustain a legal-sufficiency challenge only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). In determining whether legally sufficient evidence supports the challenged finding, we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

When reviewing a factual-sufficiency challenge under the civil standard of review, we set aside the finding at issue only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

## III. Applicable Law

Violating a single condition of probation is sufficient for a trial court to modify a juvenile's prior disposition. *In re J.Y.*, No. 02-17-00092-CV, 2017 WL 3298301, at *3 (Tex. App.—Fort Worth Aug. 3, 2017, no pet.) (mem. op.) (citing *In re S.G.V.*, No. 04-05-00605-CV, 2006 WL 923576, at *3 (Tex. App.—San Antonio Apr. 5, 2006, no pet.) (mem. op.)). A trial court may commit a juvenile to the TJJD if it finds that (1) it is in the child's best interest to be placed outside the child's home, (2) reasonable efforts have been made to prevent or eliminate the need for the child's removal from the child's home and to make it possible for him to return home, and (3) the child, in the child's home, cannot be provided the quality of care and level of support and supervision needed to meet the conditions of probation. Tex. Fam. Code Ann. § 54.04(i)(1). When a child has engaged in delinquent conduct that constitutes a felony offense, the trial court may commit the child to the TJJD without a determinate sentence "if the court makes a special commitment finding that the child has behavioral health or other special needs that cannot be met with the resources available in the community." *Id.* § 54.04013; *see id.* § 54.04(d)(2).

The trial court "is not required to exhaust all possible alternatives before sending a juvenile to the TJJD." *In re K.H.*, 682 S.W.3d 567, 576 (Tex. App.—Houston [1st Dist.] 2023, pet. denied); *see In re J.R.C.*, 236 S.W.3d 870, 875 (Tex. App.—Texarkana 2007, no pet.) ("The Texas Family Code permits a trial court to decline third and fourth chances to a juvenile who has abused a second chance."

(citing *J.P.*, 136 S.W.3d at 633)). Generally, a trial court does not abuse its discretion by committing a juvenile to the TJJD "when a delinquent juvenile has engaged in some type of violent activity that makes the juvenile potentially dangerous to the public." *K.H.*, 682 S.W.3d at 576; *In re B.R.*, No. 02-19-00328-CV, 2020 WL 3369556, at *6 (Tex. App.—Fort Worth June 18, 2020, no pet.) (mem. op.).

## IV. Analysis

In his sole point of error, R.R. contends that the trial court abused its discretion by committing him to the TJJD because, "based on the most recent evidence of success in the family home," there was insufficient evidence to support the trial court's findings that (1) his home could not provide the quality of care and level of support and supervision needed to meet the conditions of probation and (2) removal from his home was in his best interest. We conclude that the trial court did not abuse its broad discretion by committing R.R. to the TJJD.

The evidence shows that R.R. had been adjudicated delinquent for a state jail felony and subsequently committed at least two more offenses; that he had been placed on probation—regular, ISP, and Post—three times; and that he was uncontrollable at home. R.R. was highly impulsive and showed no respect for rules or authority, and on more than one occasion, he exhibited violent behavior. He did not value his education and only appeared to show interest in school while he was at the Post facility. The probation department offered numerous services to R.R. and his family, including counseling, but they did not take advantage of them. R.R. had a high

11

risk of reoffending—a risk factor that the trial court found to be "extremely concerning." The trial court expressed an apparent desire to help R.R. change the trajectory of his life.

Jenson recommended that R.R. be placed on probation again, though she could not tell the trial court what a fourth chance at probation in a different county would look like. She explained that R.R. had made progress but that he needed more counseling and more work developing the skills to help him progress. The trial court heard testimony that those services would be available to R.R. in the TJJD. Moreover, the trial court was not bound by Jenson's recommendation of probation. *See In re H.C.*, Nos. 02-18-00230-CV, 02-18-00231-CV, 02-18-00232-CV, 2019 WL 1185089, at \*20 (Tex. App.—Fort Worth Mar. 14, 2019, no pet.) (per curiam) (mem. op.) (citing Tex. Fam. Code Ann. § 54.04(b)); *In re C.G.*, No. 05-17-01063-CV, 2018 WL 2126812, at \*5 (Tex. App.—Dallas May 9, 2018, no pet.) (mem. op.) (finding no abuse of discretion when trial court ordered juvenile committed to TJJD against probation department's recommendation).

R.R. concedes that "at some point[,] there may have been sufficient evidence" to support removal-from-the-home findings. But that evidence, he asserts, was "vitiated" by the evidence showing that he "successful[ly] implement[ed]" the skills he had learned at Post. In other words, R.R. argues that the trial court should have found—based only on the evidence of his improved behavior in the two-and-a-half

12

months he spent at home following his release from Post—that removal from the home was not necessary.

While R.R.'s behavior did improve for the two-and-a-half months that he was home awaiting the disposition hearing, there was at least some evidence—the unauthorized trip to a gas station—that his home environment was not sufficiently structured and supervised. Moreover, the record indicates that the trial court considered the evidence of R.R.'s "white-knuckled good behavior" and determined that it was not enough to overcome the behavior he had exhibited in the years leading up to that point. *B.R.*, 2020 WL 3969556, at *7 (upholding trial court's order committing juvenile to TJJD despite "some qualitative improvement" in juvenile's behavior at home pending disposition (citing *In re J.M.*, 433 S.W.3d 792, 794–96 (Tex. App.—Dallas 2014, no pet.))); *cf. In re J.S.*, 993 S.W.2d 370, 375 (Tex. App.—San Antonio 1999, no pet.) (finding abuse of discretion when the juvenile "[c]learly . . . did more than exhibit temporary remorsefulness because he was caught").

We conclude that more than a scintilla of evidence supports the trial court's findings that R.R.'s home could not provide the quality of care and level of support needed to meet the conditions of probation and that it was in R.R.'s best interest to remove him from his home. Based on our review of the record, we cannot conclude that the credible evidence supporting the trial court's findings was so weak or contrary to the overwhelming weight of all the evidence as to be manifestly wrong.

13

Accordingly, we hold that the trial court did not abuse its discretion by ordering R.R. committed to the TJJD.

We overrule R.R.'s sole point of error.

### V. Conclusion

Having overruled R.R.'s sole point of error, we affirm the trial court's disposition order.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: February 6, 2025

14